IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DAVID W. WINN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No.**  15-cv-204-CJP[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff David W. Winn is before the Court, represented by counsel, seeking judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits on June 30, 2011, alleging disability beginning on September 23, 2007. (Tr. 10). After holding an evidentiary hearing, ALJ Patricia Supergan denied the application in a written decision dated September 25, 2013. (Tr. 10-19).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 10.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in her analysis at step three by applying listing 1.02 major dysfunction of a joint instead of listing 1.06 fracture of the tibia.

2. The ALJ's decision was not supported by substantial evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at

step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** See also, *Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts,

4

decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Supergan followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since his alleged onset date. She found plaintiff had severe impairments of status post fracture of left distal tibia and obesity. (Tr. 12). The ALJ determined these impairments do not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the sedentary level, with physical and mental limitations. (Tr. 14). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to perform his past work. However, he was not disabled because she was able to do other work that exists in significant numbers in the regional and national economies. (Tr. 18-19).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born on November 26, 1968 and was thirty-eight years old on his alleged onset date. He was insured for DIB through September 30, 2011.[3] (Tr. 156). He was six feet one inch tall and weighed two hundred and thirty pounds. (Tr. 168). He completed his GED in 2001 but had no further training or schooling. (Tr. 169). Plaintiff worked for the fifteen years prior to his alleged onset date in the roofing and carpentry business. (Tr. 160). Plaintiff claimed his migraine headaches, arthritis, a broken left leg from a car accident that created chronic pain and muscular atrophy, depression, and insomnia limited his ability to work. (Tr. 168). He took aspirin for heart health, Citalopram for depression and anxiety, ibuprofen and Vicodin for pain relief, Metoprolol for high blood pressure, Omeprazole for GERD, and Trazadone for insomnia. (Tr. 204).

In August 2011, plaintiff completed a function report. (Tr. 183-91). He lived in a house with his wife, mother, and son. (Tr. 183). He stated that an injury to his leg kept him from working due to pain and fear that his leg would break again. Plaintiff claimed the injury never properly healed and was frequently infected. (Tr. 183). Plaintiff stated that for fun he watched television and spent time with his family. Occasionally his friends visited him and he sometimes attended church. (Tr. 187).

Plaintiff needed help putting on his pants, washing his feet in the shower, and urinating at night. (Tr. 184). He occasionally made himself a sandwich but his wife did most of the cooking because he could not stand for

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

long periods of time. He could fold the laundry for fifteen to twenty minutes at a time if his wife brought it to him. (Tr. 185). He was able to ride in a car but did not have a license and did not go out of the house alone. He did not feel he could pay bills or handle a savings account, but he could count change and use a checkbook. (Tr. 186).

Plaintiff claimed that the pain from his injuries caused him to have difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs, completing tasks, and concentrating. He felt he could walk a few hundred feet before needing to stop and rest. (Tr. 188). He followed written and spoken instructions very well but had difficulty handling stress and changes in his routine. (Tr. 188-89). Depending on plaintiff's level of pain, he walked with a boot, crutches, or a cane. (Tr. 189).

Plaintiff's mother also completed a function report in August 2011. (Tr. 175-82). She stated that plaintiff could not climb stairs, lift heavy materials, or stand for long periods of time. (Tr. 175). Plaintiff did not perform many household chores and plaintiff's mother or wife prepared most meals. (Tr. 177). She felt plaintiff's leg injury caused him to have difficulty lifting, squatting, standing, walking, kneeling, and climbing stairs. (Tr. 180). He could follow written and spoken instructions but he did not handle stress well and had developed an anger problem due to his pain. Additionally, she stated plaintiff walked with crutches, a cane, or a brace depending on his pain level. (Tr. 181).

**2. Evidentiary Hearing**

Plaintiff was represented by counsel at the evidentiary hearing on September 19, 2013. (Tr. 26-47). He had been married for three and one half years and had three children. He stated that he was six feet one inch tall and weighed two hundred and forty pounds. (Tr. 31). Plaintiff testified that the last time he worked was in August of 2007 when he quit due to a disagreement with his company. He was in a car accident on September 23, 2007 that made him unable to work. (Tr. 29).

Plaintiff testified that the pain in his leg from the accident made him unable to work because he had always been a carpenter. He could no longer climb ladders, walk more than fifty feet, or carry anything heavy. (Tr. 30). He stated that he last tried to carry groceries and had too much pain in his lower left leg, ankle, and foot. (Tr. 31). He could occasionally help mow the lawn on the riding lawn mower but he stopped cooking and cleaning after his accident. (Tr. 32). Plaintiff did not drive because he lost his license in 1992 and never obtained another. (Tr. 33). He did not have a computer and never used one. (Tr. 35). His wife made his meals and made sure his son was ready for school every morning. (Tr. 37).

Plaintiff smoked three quarters of a pack of cigarettes daily but he rarely drank alcohol. (Tr. 33). He stated that he used marijuana several months prior to the hearing and he also used cocaine seven years before the hearing. (Tr. 34). At the time of the hearing, he was taking Metoprolol for his blood pressure, Vicodin for pain in his lower left leg, Trazodone for a sleep aid, Omeprazole for

heart burn, and Lamictal. (Tr. 38). He wore a boot to support his lower left leg, and occasionally used a crutch or a cane for support as well. (Tr. 38-39).

Plaintiff testified that the pain in his leg was, on average, an eight out of ten. (Tr. 40). He stated that he had difficulties getting in and out of the bath tub, bending over, and washing his leg. His wife had to wash his leg, back, and hair, as well as help him get dressed. (Tr. 39). He spent most of his day in a recliner because he needed to elevate his leg every thirty minutes. (Tr. 39-40). He also testified that he had migraine headaches five to seven times per month. His headaches made him have to close the blinds in a room and lie down. (Tr. 40).

A vocational expert (VE) also testified. (Tr. 41-46). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform sedentary work, limited to occasional ramp climbing, stair climbing, balancing, and stooping. He could never climb ladders, ropes, or scaffolds and could never kneel, crouch, or crawl. Additionally, the person could not work around hazards such as moving machinery or unprotected heights. The individual could perform unskilled work tasks that could be learned by demonstration in thirty days or less and would be of a simple, repetitive, and routine nature. (Tr. 43-45).

The VE testified that the person could not perform any of plaintiff's previous work. However, the person could perform jobs that exist in significant numbers in the national economy. Examples of such jobs are hand sorter,

assembler, and packer. (Tr. 43). The VE testified that if the person had three unscheduled absences from work a month the person would not be able to maintain employment. (Tr. 45).

### 3. Medical Evidence

Plaintiff's medical records begin on his alleged onset date of September 23, 2007. (Tr. 221, 309). Plaintiff presented at Union County Hospital with a fracture in his left tibia and fibula after crashing his car during a police chase. (Tr. 309-15). He was transferred to St. Francis Medical Center for irrigation, debridement[4], open reduction, and internal fixation[5] of the wound. (Tr. 221-227).

In October 2007, plaintiff began seeing Dr. Rickey Lents to follow-up on his leg fracture. (Tr. 379). Thereafter, plaintiff saw Dr. Lents almost every two weeks until the end of January 2008. (Tr. 379-99). He was doing well and the x-rays indicated his fracture was healing. (Tr. 379-91). Plaintiff was initially given a prescription for Lortab that was quickly changed to Vicodin. (Tr. 379-85). Plaintiff was given several refills for Vicodin but Dr. Lents wanted to reduce plaintiff's usage as soon as possible. (Tr. 384). Dr. Lents eventually denied plaintiff's requests for Vicodin and Lortab but gave him a prescription for Ultram. (Tr. 389, 391). Plaintiff complained regularly of pain but the results of

---

[4] Debridement is "the removal of unhealthy tissue from a wound to promote healing." http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/debridement-of-a-wound-infection-or-burn

[5] During an open reduction surgery, "orthopedic surgeons reposition your bone pieces during surgery, to put them back into their proper alignment." Internal fixation refers to "to the method of physically reconnecting the bones. This might involve special screws, plates, rods, wires, or nails that the surgeon places inside the bones to fix them in the correct place." http://www.saintlukeshealthsystem.org/health-library/tibiafibula-fracture-open-reduction-and-internal-fixation

his x-rays continued to be positive through January 2008. Dr. Lents referred plaintiff to pain specialists Drs. Burns and Bowen to help him control his pain. (Tr. 396). Dr. Burns saw plaintiff that month and indicated he would only prescribe an opioid after plaintiff had a urine screen and all other options were explored. (Tr. 389-99).

Plaintiff presented at St. Francis Medical Center again in November 2008 but left prior to triage. (Tr. 220). A few days later plaintiff reported to Dr. Lents stating that his leg was feeling unstable. X-rays displayed a nonunion of the bones in plaintiff's leg as well as a broken plate. (Tr. 401). Plaintiff had an open reduction internal fixation (ORIF) the next day.[6] (Tr. 264). He was given a bone stimulator, a prescription for Vicodin, and told to avoid all weight bearing on his leg after the surgery. (Tr. 403). When plaintiff returned to Dr. Lents in December 2008 he had been bearing weight and Dr. Lents cautioned him against placing any weight on his leg until it was fully healed. (Tr. 406). Plaintiff returned to Dr. Lents in January 2009 and while he had been walking on his leg his x-rays showed his bone graft was still in position and was healing without trouble. Plaintiff was once again cautioned not to place any weight on his leg. (Tr. 410). Dr. Lents stated he did not want to refill plaintiff's Vicodin prescription any longer. (Tr. 411).

In March 2009, plaintiff presented to Dr. Lents with another broken plate and a non-union of the bones. (Tr. 422). Plaintiff had a third ORIF thereafter.

---

[6] "An open reduction and internal fixation (ORIF) is a type of surgery used to fix broken bones. This is a two-part surgery. First, the broken bone is *reduced* or put back into place. Next, an *internal fixation* device is placed on the bone." http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/open-reduction-and-internal-fixation-surgery

(Tr. 422, 425). In June 2009, plaintiff went to Southeast Missouri Hospital's emergency room with an infection at the site of his bone graft. (Tr. 244-50. 266). His wound was cultured and it was determined plaintiff had a severe bone infection at the site of his surgeries. (Tr. 246). He was given a Vaccum-Assisted Closure (VAC) for his wound.[7] (Tr. 246, 439). Plaintiff saw several doctors for treatment of his infected wound and in October 2009 the infection had not improved. (Tr. 254-60, 261, 445-60).

Notes from Southeast Missouri Hospital from December 2009 indicate plaintiff was "angry and manipulative throughout the course of his treatment" and the treating physician felt his "demeanor was suspicious for secondary gain, i.e., narcotic seeking and/or establishment of disability for Social Security." (Tr. 267-68). Plaintiff had not adhered to recommended treatment regimens and missed several appointments so the clinic at the hospital refused to continue its involvement in plaintiff's treatment. (Tr. 267).

Plaintiff was treated by Dr. Lents in December 2009 and Dr. Lents indicated plaintiff was doing well and his wound was healing well. (Tr. 469). In early 2010 plaintiff had occasional swelling but his fracture and wound site were doing well. (Tr. 471). However, in September 2010 plaintiff had more swelling and Dr. Lents felt his infection may have reoccurred. (Tr. 472). In November 2010, Dr. Lents stated the leg may need to be amputated since other treatment options had failed. (Tr. 473). There is a gap in treatment records but

---

[7] "The V.A.C. treatment applies localized negative pressure to draw the edges of the wound to the center of the site. The negative pressure is applied to a special dressing positioned within the wound cavity or over a flap or graft." http://www.wakehealth.edu/Plastic-Surgery/Wound-Care/Vacuum-Assisted-Closure.htm

plaintiff's final records regarding his leg are from July 2013 at Cairo Diagnostic Center. The doctor made somewhat contradictory findings, stating that on examination the left distal tibular fracture appeared to have healed properly and the hardware appeared stable, but also that there was malunion of the fracture of the left distal tibia and a component or chronic osteomyelitis could be excluded. (Tr. 554).

### 4. Consultative Examinations

In September 2011, plaintiff had a physical consultative examination with state agency physician Dr. Adrian Feinerman. (Tr. 477-85). Plaintiff was wearing a brace on his lower left leg because he was afraid the fracture would break again. He stated the brace decreased his pain as well. Plaintiff stated that he was depressed but it did not interfere with his work. (Tr. 477).  Plaintiff felt he could walk for one block, stand for ten minutes, sit for one hour, and perform fine and gross manipulation normally. He told Dr. Feinerman that squatting or bending increased his pain to his left leg. (Tr. 478).

On exam, plaintiff had mild difficulty getting on or off the exam table; moderate difficulty tandem walking, squatting, and arising; and plaintiff was unable to stand on his toes or stand on his heels. Dr. Feinerman's diagnostic impressions were a fractured distal left tibia-fibula with open reduction and internal fixation. (Tr. 481). Plaintiff had a decreased range of motion in his left ankle but had an otherwise normal examination and plaintiff was able to ambulate effectively. (Tr. 480-84).

Plaintiff also had a mental consultative examination with Dr. David Warshauer in September 2011. (Tr. 488-90). Plaintiff told Dr. Warshauer he lost his license in 1992 for drag racing and he had been arrested three or four times for driving on a revoked license thereafter. He also had two DUIs and spent "a few weeks" in jail. (Tr. 488-89). Plaintiff stated that in 2006 he completed a twenty-eight day program for alcohol and a crack cocaine addiction. Plaintiff was never hospitalized for any psychiatric issues and had never received outpatient mental health treatment. He stated he could not afford medication for depression because he already owed over $400,000 in medical bills. (Tr. 489). Plaintiff was oriented in four spheres and answered questions in a relevant a coherent manner however his countenance was that of an angry person. Dr. Warshauer's diagnoses were adjustment disorder with depressed mood, possible personality disorder, and a GAF score of 50.[8] (Tr. 490).

### 5. RFC Assessment

State agency physician C.A. Gotway, M.D. assessed plaintiff's physical RFC in December 2011. (Tr. 510-16). He reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift ten pounds, stand or walk for at least two hours in an eight hour workday, and sit for about six hours in an eight hour workday. (Tr. 510). He indicated plaintiff could

---

[8] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

occasionally crouch and climb ramps or stairs but could never climb ladders, ropes, or scaffolds. (Tr. 511). Dr. Gotway stated plaintiff should avoid concentrated exposure to hazards like machinery and heights. (Tr. 513). Dr. Gotway explained his reasoning in a synopsis of plaintiff's medical records that showed plaintiff had incomplete healing but was able to ambulate effectively without assistance and had a normal gait. (Tr. 516).

These findings were reaffirmed by Dr. Rachel Gotanco of Disability Determination Service (DDS) in April 2012. (Tr. 517-19). Dr. Gotanco did not examine plaintiff but reviewed the records and found plaintiff did not meet listing 1.06 fracture of the femur, tibia, pelvis, or one or more of the tarsal bones. (Tr. 517-19). In May 2012, Dr. George Andrews of DDS also reaffirmed Dr. Gotway's opinions. (Tr. 520-22).

## Analysis

Plaintiff's first and primary argument is that the ALJ erred at step three of her analysis by referring to listing 1.02 instead of listing 1.06 and by failing to provide more than a perfunctory analysis. The Court will first look at what is required from an ALJ at step three of the five-step sequential evaluation process.

As an initial matter, the Seventh Circuit has stated that "[a]lthough an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." ***Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009).** Plaintiff claims that he meets listing 1.06 which is entitled "Fracture of

the femur, tibia, pelvis, or more of the tarsal bones." In order to meet the listing the claimant must have both: "A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." **20 C.F.R. Pt. 404, Subpt. P., App. 1, §1.06.** 1.00B2b states that

> (1) Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. . . Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. . . .

**Pt. 404, Subpt. P., App. 1, §1.00B2b(1)&(2).**

Plaintiff claims that he meets the requirements of 1.06 by referencing several medical records that indicate he had non-union of his fracture. Plaintiff references a record that states he had an asymmetric gait and another record that states he should not bear weight on his leg. (Tr. 398, 403). Plaintiff also cites his statements that he needed a crutch or cane, elevated his leg, wore a

boot, and displayed a limp consultative examination. Plaintiff notes that Dr. Feinerman indicated he had effective ambulation without an assistive device, but he also states that the doctor indicated he had decreased range of motion, deformity in his lower extremity, an inability to stand on toes or heels, moderate difficulty in tandem walking and squatting and arising, and mild difficulty getting on and off the exam table. (Tr. 481).

While the evidence demonstrates that plaintiff meets part A. of listing 1.06, his ability to meet part B. is not as clear. While Dr. Feinerman did find plaintiff had some limitations, he did not feel they affected plaintiff's ability to ambulate effectively. As the Commissioner notes, moderate difficulties with tandem walking and the inability to stand on heels and toes does not automatically indicate plaintiff could not ambulate effectively without an assistive device. No doctors on record indicated plaintiff had "insufficient lower extremity functioning. . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." **Pt. 404, Subpt. P., App. 1, §1.00B2b(1).** Plaintiff testified that he occasionally used a cane or a crutch, but never stated he used two. Plaintiff indicated he frequently walked with a boot, and presented with the boot several times on record, but the boot has no hand-held assistive device portion that limits plaintiff's usage of both upper extremities. Plaintiff does not appear to meet listing 1.06 based on the evidence provided on record.

However, giving plaintiff the benefit of the doubt, the Court will look to the ALJ's analysis at step three to determine if her analysis was sufficient. As

stated above, the Seventh Circuit has outlined the five-step sequential evaluation process in ***Weatherbee v. Astrue*** stating,

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. <u>The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues</u>. . .

**649 F.3d at 568-569 (emphasis added).**

The Seventh Circuit has held that an ALJ has a duty to "discuss the listing by name and offer more than a perfunctory analysis of the listing." ***Barnett v. Barnhart***, **381 F.3d 664, 668, (7th Cir. 2004).** At step three, ALJ Supergan stated that,

> Although the claimant has severe impairments, they do not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). In reaching this conclusion, I considered all of the listings found in 20 CFR Part 404 Subpart P, Appendix 1, paying particular attention to listing 1.02. However, the medical evidence does not document listing-level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

(Tr.14).

Plaintiff states that because the ALJ references listing 1.02 and does not mention listing 1.06 the ALJ's analysis is insufficient. Listing 1.02 is entitled "Major dysfunction of a joint(s)(due to any cause)" and is clearly not as relevant to the case at hand as listing 1.06. Plaintiff argues that listing 1.06 had to be applied to this case due to his tibia fracture because the ALJ had a duty to

"discuss the listing by name and offer more than a perfunctory analysis of the listing." ***Barnett v. Barnhart,* 381 F.3d 664, 668, (7th Cir. 2004).** The ALJ should have at least mentioned listing 1.06 and her failure to do so is error. However, as plaintiff correctly notes, an ALJ's failure to explicitly mention a relevant listing does not require reversal unless the failure to mention the listing is combined with a perfunctory analysis. ***Ibid*. at 669; *Knox,* 327 Fed.Appx. at 655.**

Plaintiff states that the ALJ's discussion at step 3 must be seen as perfunctory because it was only three sentences. He contends that she failed to state what medical evidence she considered or why she did not feel his x-rays supported listing 1.06. This is also where he provides a list of records from several doctors' appointments and x-rays that he claims confirm he meets the listing for 1.06.

The Seventh Circuit has recently clarified what makes an analysis perfunctory in ***Curvin v. Colvin*. 778 F.3d 645 (7th Cir. 2015).** In ***Curvin***, the Court stated that if an ALJ adequately discusses the appropriate issues within the RFC assessment there is no error as it would be redundant to repeat the discussion elsewhere in the opinion. ***Ibid.* at 650**. Therefore, in determining if the ALJ's analysis was sufficient, this Court must look to the ALJ's entire opinion, not just the three sentences plaintiff focuses on, to establish whether the appropriate explanation was provided.

Here, ALJ Supergan's discussion within her RFC assessment makes it evident she considered the record as a whole and formed a logical bridge to her

determination that plaintiff did not meet a listing. The ALJ provided a thorough synopsis of plaintiff's medical history regarding his leg injury. She discussed the initial injury, the initial surgery that was performed, all subsequent imaging regarding the leg, the multiple surgeries to attempt to heal the bone, the issues involved with his resulting wound, the doctors' appointments indicating plaintiff still had pain, and plaintiff's occasional usage of assistive devices in ambulation. (Tr. 15-17). She also discussed how plaintiff was non-compliant with orders to stay off of his leg, that he has been weight-bearing since December 2009, that he was able to ambulate effectively without an assistive device on examination, that his treatment was limited to pain medications for several years, and that his doctors indicated his usage of pain medication was indicative of an addiction on several occasions. (Tr. 15-18).

While the ALJ did not mention listing 1.06, the state agency reviewing physician Dr. Gotanco referenced the listing specifically and indicated plaintiff did not meet the requirements. (Tr. 517-19). Additionally, Dr. Gotway stated that plaintiff had incomplete healing in his leg but was able to ambulate effectively without assistance and had a normal gait. (Tr. 516). The ALJ gave these opinions great weight because they were "supported by the results of the consultative examination showing normal gait without an assistive device, no treatment other than pain medications since 2010, inconsistent treatment prior to that and activities such as fishing and going out to dinner." (Tr. 17). It is proper for the ALJ to rely upon the assessment of state agency consultants such as Dr. Gotway and Dr. Gotanco. ***Schmidt v. Barnhart*, 395 F.3d 737,**

745 (7**th** Cir. 2005); *Cass v. Shalala*, 8 F.3d 552, 555 (7**th** Cir. 1993). "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." **Social Security Ruling 96-6p, at 2.** Here, the opinions of Drs. Gotway and Gotanco provide sufficient support for ALJ Supergan's RFC assessment and the ALJ appropriately explained why she determined plaintiff did not meet a listing.

Plaintiff's final argument is that the ALJ's decision was not supported by substantial evidence. He states that the ALJ mischaracterized or ignored evidence that plaintiff's leg was not properly healed. He primarily focuses on the ALJ's statement that "the claimant had issues with nonunion, in part due to his lack of compliance, but even his most recent note shows he is healed." (Tr. 18). Plaintiff states that this is a mischaracterization and that it "grossly understates" the issues he has had and over what time period. He also claims that the ALJ cherry-picks evidence and only mentions notes that are favorable to her opinion. This is false.

The ALJ did state that plaintiff's most recent note shows that he is healed because his most recent note literally states the "fracture appears to have healed properly." (Tr. 554). While the note also indicates a malunion, the ALJ acknowledges this elsewhere in her opinion. (Tr. 16). Plaintiff is correct in noting that the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring

the evidence that undermines it." ***Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)**.

However, the ALJ here fully discussed plaintiff's four years of documented issues with malunion of the bones, the surgeries he underwent, and the other treatment that was recommended. (Tr. 15-18). Plaintiff takes issue with the ALJ's reference to notes indicating plaintiff was healing, but plaintiff does have several notes on record that show his fracture was improving. (*Ex.*, Tr. 379-91, 396, 410, 469, 471). While they were frequently followed by notes showing the malunion reoccurred, the ALJ stated that as well. (Tr. 15-18). The ALJ is allowed to discuss evidence that is in opposition to plaintiff as long as she evaluates the record as a whole and forms a logical bridge to her conclusions. ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).**

Additionally, the Court notes that plaintiff's non-compliance to doctor's orders regarding his treatment damages his case. The ALJ noted that plaintiff was consistently bearing weight on his leg when Dr. Lents indicated bearing weight would prevent his fracture from healing. (Tr. 403, 406, 410 ). "20 C.F.R. § 404.1530(a) provides that '[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.' The failure to do so without good reason will result in a denial of benefits. 20 C.F.R. § 404.1530(b)." ***Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000).**

While plaintiff's doctors did not indicate that his compliance would have necessarily led to being able to work, Dr. Lents did indicate plaintiff's failure to comply was causing his leg to not heal. (Tr. 403, 406, 410). The malunion of plaintiff's tibia bone is the primary reason plaintiff claims he cannot work. It logically follows that if plaintiff's behavior was contributing to the malunion, his noncompliance was contributing to, what he considered, his inability to work.

In sum, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. ***Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)**; ***Elder*, 529 F.3d 413.** ALJ Supergan's decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Supergan committed no errors of law, and that her findings are supported by substantial evidence.  Accordingly, the final decision of the Commissioner of Social Security denying David Winn's application for disability benefits is **AFFIRMED.**

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

DATE: August 5, 2016.

s/ Clifford J. Proud

CLIFFORD J. PROUD

UNITED STATES MAGISTRATE JUDGE